G. Robert Wither, J.
In 1956 the defendant issued a life insurance policy in the sum of $2,500 to Glenn W. Hoyt, containing the provision that ‘ ‘ The company shall pay an Additional Benefit of * * * ($2,500) * * * subject to the conditions, exceptions and exclusions hereinafter set forth * * * upon * * * due proof * * * (ii) that the death of the Insured was caused directly and independently of all other causes, by a bodily injury sustained solely by external, violent and accidental means * * * (iv) that such bodily injury was evidenced by a visible wound or contusion on the exterior of the Insured’s body, unless death resulted from * * * an internal injury revealed by an autopsy and consisting solely and *936 exclusively of a contusion, a rupture or a fracture of an internal organ or part of the Insured’s body.” The insured’s mother was originally the beneficiary of the policy, but after he married the plaintiff, the latter’s name was substituted as beneficiary in 1958.
It appears that Mr. Hoyt had had a rheumatic heart condition since childhood, but he was in apparent good health and his heart condition did not bother him until the ¡Spring of 1962, when he began to tire easily and have trouble breathing. In May of 1962, he entered Park Avenue Hospital for eight or nine days. The plaintiff testified that the insured felt good upon leaving the hospital; but there is evidence that on leaving he had the same symptoms that he had on entering. On June 7 through 9, 1962 he was in the Strong Memorial Hospital for tests and exploratory work and treatment. On July 20, 1962 a date in September, 1962 was set for a heart valve repair operation on Mr. Hoyt. His condition apparently deteriorated fast thereafter, and on the early morning of July 31, 1962 he was readmitted to the Strong Memorial Hospital.
At the time of this last admission he had extreme shortness of breath and weakness of pulse, as a result of rheumatic fever in the heart, with fluid in the pericardial sac. He was found to have a badly diseased heart and to be in serious condition. By evening of that day he was placed upon the danger list, and continued thereon until his death on August 2,1964. It was necessary for him to sit up in bed, to facilitate his breathing and to lessen the fluid pressure on his organs. Although he responded to treatment on August 1, 1962, it was felt that he was not improving as well as he should in view of the drugs administered to him. Further tests indicated to the group of doctors attending him that additional fluid was gathering in the pericardial sac, resulting cardiac tamponade — excess pressure on the heart, reducing its capabilities; and a cardiac centesis (tap of the pericardial sac through the chest wall) was determined to be necessary. He duly executed a consent to this tap, having been correctly told that such a procedure is routine and without much danger. This tap was performed at bedside at about 3:35 p.m. on August 2, 1962, monitored by an electrocardiogram. A number 18 hollow needle was used, said to be about the size of the lead in a common lead pencil. It was inserted under the sternum diagonally upward toward the heart and pericardial sac, a distance of three centimeters — about 1% inches. On securing only about one ounce of fluid, including fresh blood, the tap was removed, according to Dr. Robinson, the assistant resident who participated therein, “ to assess the situation.” Within five minutes *937 the patient ceased to breathe. Emergency measures were undertaken to revive him, with a little success, but by 4:20 p.m. he was pronounced dead.
The plaintiff testified that she was in the hall outside of her husband’s room during the tapping procedure, and at one point she heard him scream, and then observed the hospital staff using emergency measures to resuscitate him. Dr. Robinson said he remembers no scream, and doubts that the patient felt any pain during the procedure, to cause him to scream. An autopsy was performed upon decedent’s heart, and it revealed a cut or tear in the wall of the right ventricle area of the heart two centimeters wide — nearly an inch — near the area of the chest where the needle had been inserted.
The three doctors who testified, Dr. Retry, called by the plaintiff, and Drs. Missal and Robinson, called by the defendant, agreed that although merely touching the heart with the instrument would not be harmful, it was preferable not to touch it, and that in any event the instrument should not penetrate or cut the heart. The latter two, however, testified that it is not uncommon now for an instrument to be inserted through the heart wall to test the blood pressure within, and that such may be done without ill effect. Dr. Retry testified that the heart was torn by the tap procedure, making a one-inch opening into the right ventricle, causing blood to flow into the pericardial sac, and resulting in hemorrhagic cardiac tamponade, i.e., pressure on the heart from blood in the sac around the heart, and that this was the immediate cause of death. He said that the tear was such as to cause death in this manner to a person of normal health.
Dr. Robinson testified that in his opinion, with medical certainty, the tap needle did cut or tear the heart; but he said that he still cannot understand how it could have reached the heart or made the cut or tear, unless unusual and irregular movement of the enlarged heart at the time caused it. The autopsy showed that a probe could be passed through the cut or tear in the heart wall into the right ventricle of the heart. Dr. Robinson could not remember the outline of the cut or tear. Although he saw it at the autopsy and remembers that it was two centimeters wide, he does not recall and does not believe that it was that wide all the way through the wall into the ventricle. Both he and Dr. Missal stated that the cut into the heart was a contributing and accelerating cause of death, but that the patient would have died in a few hours anyway, absent a successful cardiac centesis, and possibly in any event. Furthermore, Dr. Missal testified that the experience with respect to the heart *938 valve repair operation which insured was scheduled to have in September, is that death results in 30 per cent of the cases.
In view of the testimony of Doctors Petry and Bobinson, above referred to, and the statement on the certificate of death, Exhibit 2, that the immediate cause of death was hemorrhagic cardiac tamponade due to traumatic myocardial laceration, which certificate is prima facie evidence of the cause of death (Gioia v. State of New York, 22 A D 2d 181, 184; Brownrigg v. Boston & Albany R. R., 8 A D 2d 141, 143; CPLR 4520; Public Health Law, § 4103, subd. 2), there is no question in my mind that the cut in the heart was the result of “ external, violent and accidental means ’ ’ within the term of the policy, and caused Mr. Hoyt’s death. (Burr v. Commercial Travelers Mut. Acc. Assn., 295 N. Y. 294, 302-303; Mansbacher v. Prudential Ins. Co., 273 N. Y. 140; Burch v. Prudential Ins. Co., 250 App. Div. 450, 451; and, see, Begley v. Prudential Ins. Co. of America, 1 N Y 2d 530.)
The difficult point of decision in this case is whether the death which followed the accident “was caused directly and independently of all other causes.” We do not have here a case where the insured was in vigorous health and the accident was the apparent and “ adequate cause ” of death (Lewis v. Ocean Acc. & Guar. Corp., 224 N. Y. 18, 21); neither is it, however, a case where there is no evidence that death was caused other than by the insured’s previous condition. (Ursaner v. Metropolitan Life Ins. Co., 274 App. Div. 77, affd. 299 N. Y. 730.) A preponderance of the evidence shows, I find, that the wound in the insured’s heart which was accidentally caused was of such magnitude that it would have caused death to a normal person. That being so, it is not significant that the insured was seriously ill. Although his prospects were not bright, it cannot be said, and it was not said, that even without the accidental tearing of the heart during the centesis procedure, the insured would surely have died. The accident did, therefore, cause his death directly and independently of all other causes, as provided in the policy of insurance. (See Silverstein v. Metropolitan Life Ins. Co., 254 N. Y. 81, 85; Lewis v. Ocean Acc. & Guar. Corp., supra, pp. 21-22.)
The defendant having paid to the plaintiff the amount of the ordinary death benefit of the policy, but having declined to pay the additional amount provided in case of accidental death, judgment is awarded to the plaintiff in the sum of $2,500, plus interest thereon from October 5, 1962, together with the costs and disbursements of this action.